## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CHERRI HUDSON,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:21-CV-00199-MHH** |
| | } | |
| | } | |
| **KILOLO KIJAKAZI** | } | |
| **Commissioner of the Social Security** | } | |
| **Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Cherri Hudson seeks judicial review of a final adverse decision of the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). The Commissioner issued a partially favorable decision. An Administrative Law Judge—an ALJ—granted Ms. Hudson's application for supplemental security income with a disability onset date of December 15, 2017 but denied Ms. Hudson's application for disability insurance benefits because the ALJ found that Ms. Hudson was not disabled before September 30, 2014, the date she was last insured, and

denied Ms. Hudson's request for supplemental security income between December 2012 and December 15, 2017. (Doc. 9-18, pp. 40-41).[1]

Ms. Hudson challenges the ALJ's determination that she was not disabled before December 15, 2017 for several reasons. Ms. Hudson argues that substantial evidence does not support the ALJ's finding at step two that she did not have a severe mental impairment. Ms. Hudson also argues that the ALJ improperly rejected Dr. June Nichols's mental limitations opinion, erroneously considered the side effects of pain medication, and failed to properly apply Grid Rule 201.14. After careful consideration of the administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Hudson had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period

---

[1] A claimant is eligible for disability insurance benefits if she had a disability on or before the date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A). If a claimant becomes disabled after her insured status expires, the ALJ must deny the disability insurance benefits claim. The date of last insured requirement does not apply to a claim for SSI benefits.

of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited August 13, 2023).

In 2015, Ms. Hudson filed applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 9-5, pp. 2-5). Ms. Hudson alleged that her disability began on December 17, 2012. (Doc. 9-5, p. 7). The Commissioner initially denied Ms. Hudson's claims, and Ms. Hudson requested a hearing before an ALJ. (Doc. 9-6, pp. 2, 4-14). Ms. Hudson and her attorney attended her administrative hearing on September 21, 2016. (Doc. 9-3, pp. 54-79). The ALJ issued an unfavorable decision on February 8, 2017. (Doc. 9-3, pp. 38-49). The Appeals Council subsequently denied Ms. Hudson's request for review. (Doc. 9-3, pp. 2-5).

Ms. Hudson appealed the denial to the United States District Court for the Northern District of Alabama. (*See* 4:17-cv-01262-ACA). On March 22, 2019, the Court reversed and remanded the case for further proceedings because the ALJ failed to consider Ms. Hudson's testimony regarding the side effects of her pain medication. (*See* 4:17-cv-01262-ACA, Docs. 15, 16 ).[3] To comply with the Court's

---

[3] Judge Axon remanded the Commissioner's decision based on the ALJ's incorrect statement that Ms. Hudson "did not testify to any side effects from her medication at the hearing." (4:17-cv-01262-ACA, Doc. 15, p. 8). Judge Axon explained that the ALJ's statement was "plainly incorrect" because Ms. Hudson had testified at the hearing that "her oxycodone made her drowsy and led her to take naps during the day." (4:17-cv-01262-ACA, Doc. 15, p. 8). Judge Axon acknowledged that had the ALJ properly applied the pain standard and explained why substantial evidence in the record did not support Ms. Hudson's subjective testimony regarding her medication side effects, "the court would be bound by that credibility determination." (4:17-cv-01262-ACA, Doc. 15, p. 7). Because the ALJ ignored Ms. Hudson's testimony regarding her medication side effects and based her decision on an incorrect description of the record, Judge Axon remanded the case for additional administrative proceedings. (4:17-cv-01262-ACA, Doc. 15, pp. 7-8).

order, the Appeals Council vacated the Commissioner's final decision and remanded the case to an ALJ for further proceedings.  (Doc. 9-19, p. 45).

On remand, Ms. Hudson and her attorney attended a hearing before the ALJ on December 18, 2019 and a supplemental telephone hearing on June 17, 2020. (Doc. 9-18, pp. 50-92).  On July 1, 2020, the ALJ issued a new, partially favorable decision.  (Doc. 9-18, pp. 13-41).  The ALJ granted Ms. Hudson's application for supplemental security income but found that Ms. Hudson became disabled when Ms. Hudson's age category changed to an individual of advanced age on December 15, 2017 and not when Ms. Hudson claimed her disability began on December 17, 2012. (Doc. 9-18, pp. 39-40).  The ALJ denied Ms. Hudson's application for disability insurance benefits because she was not disabled before September 30, 2014, the date she was last insured.  (Doc. 9-18, pp. 40-41).

Ms. Hudson filed written exceptions to the ALJ's decision, but the Appeals Council found no basis for changing the ALJ's decision.  (Doc. 9-18, pp. 2-4).  The Appeals Council stated that the ALJ's decision was the "final decision of the Commissioner of Social Security after remand by the Court."  (Doc. 9-18, pp. 2-4). Therefore, the Commissioner's decision is final and is a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

The administrative record contains medical records for Ms. Hudson dating to 1991.  Ms. Hudson was in the Air National Guard for six years and the Army Reserves for 17 years.  She was a Gulf War veteran who, during her deployment from October 29, 2001 to November 15, 2003, served in Afghanistan as a chemical specialist for six months.  (Doc. 9-3, p. 11; Doc. 9-14, pp. 8, 30).  Most of her medical records relate to treatment by medical professionals through the Veterans Administration.  Ms. Hudson's medical records relate to the diagnoses and treatment of major depressive disorder, anxiety, degenerative disc disease, bilateral foot numbness because of plantar fasciitis, insomnia, severe hand pain because of Dupuytren's contracture, irritable bowel syndrome, and arthritis in both knees.  The Court has reviewed Ms. Hudson's complete medical history and summarizes the following medical records because they are the most relevant to Ms. Hudson's arguments in this appeal.

### *Ms. Hudson's Medical Records*

Between 2004 and 2011, Ms. Hudson sought mental health treatment for depression at the VA Psychiatric Clinic in Gadsden.  She saw Dr. Huma Khusro.  In April 2004, Ms. Hudson reported that she was activated in the reserves in 2002 and served in Afghanistan for six months.  (Doc. 9-13, p. 48).  After returning from her deployment in Afghanistan, Ms. Hudson reported that she "began to get depressed,"

did not "feel good anymore," felt "stressed," had increased fatigue, could not sleep, and suffered "crying spells with passive suicidal ideation." (Doc. 9-13, p. 48). "She also had active ideation, but report[ed] that she [did] not have that anymore." (Doc. 9-13, p. 48). Dr. Khusro diagnosed her with major depressive disorder and prescribed Wellbutrin and therapy. (Doc. 9-13, pp. 50-51).

At a June 2005 appointment, Ms. Hudson reported that she was doing well and had no complaints. (Doc. 9-13, p. 12). She had stopped taking her medication because she was "drinking wine on a very regular basis, but she was trying to curtail her drinking. (Doc. 9-13, p. 12). She had not filled her prescription for several months. (Doc. 9-13, p. 12). Dr. Khusro noted in July 2006 that Ms. Hudson's depression was "in remission." (Doc. 9-12, p. 205).

In March 2007, Ms. Hudson reported to Dr. Khusro that she was "doing well" and that she was attending college at Jacksonville State University. (Doc. 9-12, p. 190). Ms. Hudson reported that she had trouble sleeping when she took Wellbutrin for her depression. Therefore, Dr. Khusro prescribed Celexa and eliminated Ms. Hudson's prescription for Wellbutrin. (Doc. 9-12, p. 190). When she returned to Dr. Khusro in September 2007, Ms. Hudson reported that she was "not depressed" and was "doing fairly well." (Doc. 9-12, p. 167).

Ms. Hudson reported in March 2008 to Dr. Khusro and CRNP Judith Morris that she was doing well overall, but she did "get a little down on occasion," and she

was not taking her "Celexa consistently." (Doc. 9-12, p. 159). Dr. Khusro released Ms. Hudson to her primary care physician but explained that she could return any time if she had problems. (Doc. 9-12, p. 160). In March 2009, Ms. Hudson reported to social worker Thomas Johnson at the VA that she had difficulty with her math class at Jacksonville State University and sometimes had "difficulty focusing on tasks." (Doc. 9-12, p. 123).

In July 2009, psychologist Dr. Celia Huston at the VA performed a "C&P Exam" on Ms. Hudson to assess her depression. (Doc. 9-12, p. 109).[4] Dr. Huston noted that Ms. Hudson attended classes at Jacksonville State University but was "having a difficult time and hire[d] tutors." (Doc. 9-12, p. 110). Ms. Hudson reported that individual psychotherapy was "fair[ly]" effective but that she "just [couldn't] think to take pills." (Doc. 9-12, p. 111). Dr. Huston noted Ms. Hudson's reports of anxiety and panic attacks, "low energy, intermittent sleep disturbance, dysthymic mood, anhedonia, social isolation, [and] impaired memory and concentration." (Doc. 9-12, p. 111). Dr. Huston indicated that Ms. Hudson had a blunted affect and dysphoric mood; could not do "serial 7's"; "remembered 0/3 words after an interval and 1 with a hint"; was "mistrustful" and thought people were

---

[4] As part of the VA disability claim process, the VA may require a claimant to submit to an examination by a medical professional. The examination is called a "VA claim exam" or a "compensation & pension (C&P) exam." *See* https://www.benefits.va.gov/COMPENSATION/docs/Claims_Exam_Factsheet_Final_Approved .pdf (last visited Aug. 25, 2023).

talking about her all the time; and did not sleep well and was drowsy during the day." (Doc. 9-12, pp. 111-12).

Dr. Huston diagnosed Ms. Hudson with "major depressive disorder, recurrent, mild." (Doc. 9-12, p. 114). Dr. Huston reported that Ms. Hudson had "occasional decrease in work efficiency" and "intermittent periods of inability to perform occupational tasks" because of her major depressive disorder. (Doc. 9-12, p. 114). Dr. Huston noted that Ms. Hudson had few friends and few leisure interests, was unemployed, had a difficult time with her studies, had a chronically depressed mood, and had impaired memory and concentration. (Doc. 9-12, p. 114).

In December 2009, Dr. Khusro indicated that Ms. Hudson's depression was "in remission." (Doc. 9-12, p. 85). Ms. Hudson saw CRNP Morris at the VA Mental Health Clinic in February 2010 and reported that her depression came and went and that she was anxious at times. (Doc. 9-12, p. 71). CRNP Morris noted that Ms. Hudson had not "ordered" her depression medications since December 2009 and described Ms. Hudson's depression as in "partial remission." (Doc. 9-12, p. 71). During visits in April, June, August, and October 2010, CRNP Morris noted that Ms. Hudson continued to struggle with depression and anxiety, had trouble sleeping, felt stressed, isolated herself at home, did not do well in crowds, and had no medication side effects from Zoloft or Trazadone. (Doc. 9-12, pp. 14, 30, 45; Doc.

9-11, p. 191).  CRNP Morris increased Ms. Hudson's Zoloft prescription to 200 mg once a day.  (Doc. 9-11, p. 192).

During a January 2011 appointment with CRNP Morris, Ms. Hudson stated that she had graduated from college in December 2010 and felt "lost" because she had nothing to do.  (Doc. 9-11, p. 179).  Ms. Hudson reported that she continued to struggle with depression and anxiety.  (Doc. 9-11, p. 179).  She stated that she was "considering completing her Master's degree" and was looking for a job.  (Doc. 9-11, p. 179).  Ms. Hudson reported no medication side effects, and CRNP Morris added a prescription for Abilify for Ms. Hudson's depression.  (Doc. 9-11, pp. 179-80).

Ms. Hudson returned to CRNP Morris on April 18, 2011 and reported that she continued to struggle with anxiety and depression at times and had intrusive memories from her time in Afghanistan.  (Doc. 9-11, p. 156).  Ms. Hudson reported that she had moved into her mother's house to take care of her ailing mother, which had caused increased stress in dealing with her siblings.  (Doc. 9-11, p. 156).  She stated she was sleeping well and had no medication side effects.  (Doc. 9-11, p. 156).  By a July 22, 2011 visit, Ms. Hudson had lost weight, was taking care of her mother with little help, and continued to struggle with depression and anxiety.  (Doc. 9-11, p. 142).  Because Ms. Hudson reported that Zoloft was not working, CRNP Morris tapered Ms. Hudson from Zoloft and prescribed Effexor for depression.  (Doc. 9-11,

p. 143).   During an October 24, 2011 appointment, Ms. Hudson continued to feel stressed, had "a lot of anxiety," and had intrusive memories of Afghanistan.  (Doc. 9-11, p. 115).  CRNP Morris noted that Ms. Hudson had major depressive disorder, single episode, moderate and recommended "[s]upportive psychotherapy."  (Doc. 9-11, p. 115).

On March 10, 2012, Ms. Hudson's son took her to the emergency room at the Birmingham VA Medical Center because of a "major change in her mood, personality, and overall mental health."  (Doc. 9-11, pp. 103-04).  Ms. Hudson's son reported that Ms. Hudson had no interest in any activity in life, had stopped going anywhere, refused to eat, and had stopped attending church.  (Doc. 9-11, p. 104). Attending physician Dr. Jerry Howell noted that Ms. Hudson's weight had decreased from 179 pounds in 2010 to 120 pounds in 2012, and she was not taking her "psychotropic meds."   (Doc. 9-11, p. 104).   Ms. Hudson denied "physical symptoms" and denied a "depressed mood [and] anxiety." (Doc. 9-11, p. 106).  Dr. Howell opined that Ms. Hudson lacked insight and recommended that Ms. Hudson receive inpatient psychiatric treatment "due to significant decline in her mental and physical health."  (Doc. 9-11, pp. 104, 106).

Ms. Hudson received inpatient psychiatric treatment at St. Vincent's East with Dr. Simon McClure through March 17, 2012.  (Doc. 9-17, pp. 2-4, 62).  Dr. McClure diagnosed Ms. Hudson with "[m]ajor depression, severe."  (Doc. 9-17, p. 4).  Ms.

Hudson was to follow up with a psychiatrist at the VA Mental Health Clinic on March 21, 2012 but did not attend that appointment. (Doc. 9-11, pp. 99, 103; Doc. 9-17, p. 62).

After her discharge from the hospital, Ms. Hudson moved in with her son in Huntsville. (Doc. 9-11, p. 103). Ms. Hudson saw CRNP Morris at the VA Mental Health Clinic on June 11, 2012 and brought her two sons to the visit. (Doc. 9-11, p. 98). Ms. Hudson reported that she was "doing ok," but her sons reported that Ms. Hudson had stopped going to church and "did not get out of the house." (Doc. 9-11, p. 99). CRNP Morris noted that Ms. Hudson's mood was "somewhat depressed," her affect was constricted, and she was "cognitively intact." (Doc. 9-11, p. 99). CRNP Morris diagnosed Ms. Hudson with major depressive disorder, single episode, moderate. (Doc. 9-11, p. 99).

Ms. Hudson saw Dr. Geetha Scariya at the VA Mental Health Clinic in Decatur on August 27, 2012 and reported that she was being treated for depression. (Doc. 9-11, p. 84). She told Dr. Scariya that she was "going to keep her app[ointment] with Gadsden psychiatry for now" and would let Dr. Scariya know "when she want[ed] to transfer." (Doc. 9-11, p. 85). Ms. Hudson refused tests to explore her significant weight loss. (Doc. 9-11, pp. 84-85).

On November 21, 2012, Ms. Hudson's son called the VA Mental Health Clinic and expressed concern for his mother. (Doc. 9-11, p. 81). Ms. Hudson's son

reported to VA staff that his mother's inpatient treatment in March "helped" and that she was "better for a little while."  (Doc. 9-11, p. 83).  Her son reported that she began to decline and was in a "deep depression and [was] not getting better."  (Doc. 9-11, p. 81).  Ms. Hudson did not have a telephone for the VA staff to call her.  (Doc. 9-11, p. 81).  Her son consulted her and reported that she did "not want to be seen." (Doc. 9-11, p. 82).

On April 5, 2013, Ms. Hudson and her son visited social worker Joe Dooley at the VA Mental Health Clinic in Decatur.  (Doc. 9-11, p. 79).  Outside the presence of her son, Ms. Hudson reported to Mr. Dooley that she "need[ed] medication only and [did] not want therapy."  (Doc. 9-11, p. 79).  Ms. Hudson told Mr. Dooley that she "ran out of medication months ago."  (Doc. 9-11, p. 79).  Mr. Dooley noted that when her son entered the room, Ms. Hudson "stated she had started taking medication."  (Doc. 9-11, p. 79).  Her son asked that his mother receive therapy for her isolation and lack of socialization and indicated that Ms. Hudson had stopped going to church as frequently, had decreased "interest in doing anything," and had stopped looking for employment.  (Doc. 9-11, p. 79).

On May 7, 2013, Ms. Hudson saw psychiatrist Dr. Calvin Harris at the VA Mental Health Clinic.  (Doc. 9-11, p. 72).  Ms. Hudson reported that she had moved to Huntsville and had "been off medications for several months."  (Doc. 9-11, p. 72). She reported that she felt well and was "not sure she need[ed] medications."  (Doc.

9-11, p. 72).  Dr. Harris noted that he spent an hour with Ms. Hudson, and she had a dysphoric mood, constricted affect, logical thought processes, and intact recent and remote memory.  (Doc. 9-11, p. 75).  Dr. Harris diagnosed Ms. Hudson with "[m]ajor depression recurrent, moderate" and restarted her prescriptions for Effexor, Zyprexa, and Remeron for depression.  (Doc. 9-11, p. 75).

Ms. Hudson's next treatment note is dated April 9, 2015.  On that date, she saw Psychiatric Mental Health Nurse Practitioner Tracy Vess at the VA Mental Health clinic in Gadsden.  (Doc. 9-11, p. 62).  Ms. Hudson stated that she had "kind of been off this earth for about 3 years now" and had moved back to Gadsden to live with her mother and sister.  (Doc. 9-11, p. 62).  She reported difficulty sleeping, self-isolation, and anhedonia.  (Doc. 9-11, p. 62).[5]  PMHNP Vess noted that Ms. Hudson had a "history of medication non[-]compliance."  (Doc. 9-11, p. 62).  PMHNP Vess diagnosed major depressive disorder.  (Doc. 9-11, p. 66).

At a June 3, 2015 visit, PMHNP Vess noted that Ms. Hudson reported "doing okay" but had difficulty falling asleep and rated her pain at a 2/10.  (Doc. 9-11, p. 26).  Ms. Hudson stated that she slept if she took trazadone, still felt "'a little down,'" and did not want to attend therapy.  (Doc. 9-11, p. 26).

---

[5] Anhedonia "refers to the reduced ability to experience pleasure" and is a "core feature of major depressive disorder."  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3181880/ (last visited Aug. 21, 2023).

At a visit on July 9, 2015 with PMHNP Vess, Ms. Hudson reported that she was in a better mood.  (Doc. 9-13, p. 98).  Ms. Hudson asked if her Zoloft could be used for "OCD" and reported that she did not think the Zoloft was working because she could not leave the house until everything was "done."  (Doc. 9-13, pp. 97-98). At an August 27, 2015 visit, Ms. Hudson reported to PMHNP Vess that her pain was a 7/10 and that she had no medication side effects.  Ms. Hudson stated that she was "doing sorta-kinda" and would schedule an appointment with a therapist.  (Doc. 9-13, p. 158).

On August 31, 2015, Ms. Hudson saw psychologist Dr. Kristi Clements at the VA Mental Health Clinic for an assessment for post-traumatic stress syndrome. (Doc. 9-13, pp. 148-54).  Dr. Clements noted that Ms. Hudson's "initial PTSD C&P exam was conducted 8/3/2004 with [a] diagnosis of 'depression secondary to her illness and experiences in Afghanistan.'"  (Doc. 9-13, p. 148).  Dr. Clements cited a July 22, 2009 C&P exam that yielded a "diagnosis of MDD, Recurrent, Mild."  (Doc. 9-13, p. 148).  Ms. Hudson reported trouble sleeping, self-isolation, daytime fatigue, irritability, obsessive cleaning, and sporadic panic attacks.  (Doc. 9-13, p. 154).

Dr. Clements found that Ms. Hudson did "not appear to meet [the] DSM5 criteria for a diagnosis of PTSD at th[e] time."  Dr. Clements diagnosed Ms. Hudson with "unspecified depressive disorder."  (Doc. 9-13, p. 148).  Dr. Clements opined that Ms. Hudson's depressive disorder would cause "occasional decrease in work

efficiency and intermittent periods of inability to perform occupational tasks." (Doc. 9-13, pp. 148-49).   Dr. Clements opined that Ms. Hudson would "generally function[] satisfactorily, with normal routine behavior, self-care[,] and conversation." (Doc. 9-13, pp. 148-49).

During visits in April and July 2016 with PMHNP Vess at the VA Mental Health Clinic, Ms. Hudson reported improved sleep, anxiety, irritability, and self-isolation.  (Doc. 9-4, p. 142; Doc. 9-17, pp. 125-26).   PMHNP Vess noted Ms. Hudson's agreement "to try to be more compliant with medications." (Doc. 9-4, p. 143).   PMHNP Vess's mental examination indicated that Ms. Hudson had an appropriate affect; dysthymic mood; logical thought process; and intact judgment, insight, memory, and concentration.  (Doc. 9-4, pp. 143-44; Doc. 9-17, pp. 127-28).

On October 13, 2016, Ms. Hudson had a video telehealth visit with Nurse Practitioner Catherine Schreiber-Jones with the VA Mental Health Clinic.  (Doc. 9-4, p. 89).  Ms. Hudson reported that she was doing "alright," slept better, walked when she felt sad, and enjoyed going to church and reading.  (Doc. 9-4, p. 89). NP Schreiber-Jones noted that Ms. Hudson had a congruent mood, logical thought processes, "fair/good" insight and judgment, "grossly intact" recent and remote memory, and sufficient attention and concentration during the visit.  (Doc. 9-4, p. 94).  NP Schreiber-Jones assessed Ms. Hudson's depression as "stable" even though

Ms. Hudson was not taking her depression medication every day as prescribed. (Doc. 9-4, p. 90).

On January 12, 2017, Ms. Hudson had a video telehealth visit with psychiatrist Dr. Daniel Dahl at the VA Mental Health Clinic.  (Doc. 9-4, p. 62).  Ms. Hudson reported that she was doing "ok," her sleep was "fair," she was walking "3-4 days a week," but her energy was "down."  (Doc. 9-4, p. 63).  Dr. Dahl stated that Ms. Hudson had a melancholy mood, calm affect, logical thought processes, and fair judgment and insight. (Doc. 9-4, p. 65). Dr. Dahl diagnosed Ms. Hudson with major depression, recurrent and continued her on Zoloft and trazadone.  (Doc. 9-4, p. 66).

At a video telehealth visit on March 16, 2017, Ms. Hudson reported to NP Schreiber-Jones that she was "pretty good," slept well, enjoyed walking, and completed her activities of daily living independently.  (Doc. 9-4, pp. 41-42).  Ms. Hudson stated that she was taking her medications as prescribed, had a "good" mood, and agreed to increase her Zoloft "for greater efficacy."  (Doc. 9-4, p. 42).

On March 31, 2017, Ms. Hudson visited Psychiatric Nurse Practitioner Jennifer Wilson at the VA Mental Health Clinic.  (Doc. 9-4, p. 20).  When asked about having "anxiety/depression," Ms. Hudson responded: "Not really, life's ups and downs."  (Doc. 9-4, p. 19).  Ms. Hudson reported that her severe anxiety, irritability, self-isolation, and insomnia were improving.  (Doc. 9-4, p. 20).  Ms. Hudson reported that she was "doing well" on her medications and had no side

effects.  (Doc. 9-4, p. 21).  PNP Wilson described Ms. Hudson's major depressive disorder as "recurrent, mild."  (Doc. 9-4, p. 21).

On November 26, 2019, Ms. Hudson saw PNP Wilson at the VA Mental Health Clinic.  (Doc. 9-28, p. 46).  PNP Wilson noted that Ms. Hudson "was last seen by this provider on 3/31/2017."  (Doc. 9-28, p. 47).  Ms. Hudson denied "prolonged depression or mood swings" and reported improvement in her insomnia, severe anxiety, irritability, and self-isolation.  (Doc. 9-28, p. 47).  She stated that her medications had been renewed a few months earlier and described her medications as "effective" for her mood.  (Doc. 9-28, p. 47).  On April 2, 2020, Ms. Hudson again reported that she did not have prolonged depression or mood swings and that her medication was effective.  (Doc. 9-28, p. 26).

### Consultative Opinions

#### Dr. June Nichols's Consultative Psychological Examination

On August 25, 2015, psychologist June Nichols examined Ms. Hudson at the request of the Social Security Administration.  (Doc. 9-13, pp. 107-10).  Dr. Nichols reviewed Ms. Hudson's medical records and considered them in her assessment. (Doc. 9-13, p. 110).  Ms. Hudson reported that she had "ongoing depression" that had been "heavier than normal" for the preceding three years.  (Doc. 9-13, p. 107). She reported that her medications had been "beneficial" somewhat, but she had not been "doing so well."  (Doc. 9-13, p. 107).  She stated that she had trouble sleeping,

that she had lost weight, and that her energy was low.  (Doc. 9-13, p. 108).  She reported that she had panic attacks, was bothered by loud noises, and had nightmares and flashbacks to her time in Afghanistan.  (Doc. 9-13, p. 109).  Ms. Hudson said that she had "contemplated suicide, but [her] kids would have to bury [her]."  (Doc. 9-13, p. 109).

Regarding her daily activities, Ms. Hudson reported that she lived with her mother, watched television, and stayed in the house.  (Doc. 9-13, p. 109).  Ms. Hudson stated that she spent a "good deal of time in her bed," ate three meals a day, did not attend church, and had a few friends.  (Doc. 9-13, p. 109).  Ms. Hudson reported that her sister came over to take care of the house.  (Doc. 9-13, p. 109).

During the examination, Dr. Nichols noted that Ms. Hudson had a depressed mood, congruent thought processes, a tearful affect, clear stream of consciousness, slow mental processing, intact recent and remote memory, and good insight and judgment.  (Doc. 9-13, pp. 108-09).  Dr. Nichols diagnosed Ms. Hudson with severe recurring major depressive disorder, panic disorder without agoraphobia, post-traumatic stress disorder, and obsessive-compulsive disorder.  (Doc. 9-13, p. 109).  Noting Ms. Hudson's severe depression symptoms, PTSD flashbacks and nightmares, severe anxiety, and frequent panic attacks, Dr. Nichols concluded that Ms. Hudson's impairments would compromise her "ability to relate interpersonally and withstand the pressures of everyday work"; that she had no deficits that would

interfere with her ability to remember, understand, and carry out work-related instructions; that her severe anxiety and panic attacks were "frequent" and would "markedly interfere with concentration, persistence[,] and pace"; and that Ms. Hudson could not live independently because of her "excessive fear." (Doc. 9-13, p. 110).

### Dr. Gloria Rogue's Consultative Medical Opinion

On September 30, 2015, Dr. Rogue evaluated Ms. Hudson's medical records at the request of the Social Security Administration. Dr. Rogue noted a gap in Ms. Hudson's mental health treatment between 2012 and 2015. (Doc. 9-5, p. 13). Dr. Rogue concluded that the record contained "insufficient evidence to rate the severity of [Ms. Hudson's] mental condition" between the alleged disability onset date and the date of her last insured on September 30, 2014. (Doc. 9-5, p. 13).

### Dr. Dana K. Davis's Consultative Psychological Evaluation

At the request of the Social Security Administration, Dr. Davis reviewed Dr. Nichols's August 2015 opinion and performed a psychological examination of Ms. Hudson on April 18, 2016. (Doc. 9-14, pp. 29-32). Ms. Hudson reported that she lived with and took care of her bedridden mother. (Doc. 9-14, pp. 29, 31). Ms. Hudson indicated that she was independent in all her activities of daily living, drove, cleaned, cooked, went to church, sang in the choir, had a boyfriend, and saw her sons

and grandchildren as often as she could.  (Doc. 9-14, p. 31).  She was prescribed tradazone and Sertraline.  (Doc. 9-14, p. 29).

Ms. Hudson reported that she had experienced "a real depressed place in her life where she was not eating," and "she lost a lot of weight."  (Doc. 9-14, p. 32).  She stated that she had "moved beyond that" and was "very hopeful about the future."  (Doc. 9-14, p. 32).  She complained of "periodic sadness and anxious moods" but indicated those episodes were "not like previously."  (Doc. 9-14, p. 32).  Ms. Hudson told Dr. Davis that "over a couple of years of treatment she got herself together," never was "treated as an inpatient," had "come a long way," and was "feeling much better."  (Doc. 9-14, p. 29).

Dr. Davis's mental examination indicated that Ms. Hudson had an euthymic mood, appropriate affect, logical though process, and normal judgment.  (Doc. 9-14, p. 31).  Dr. Davis diagnosed Ms. Hudson with "[d]epressive disorder, unspecified, mild to moderate features."  (Doc. 9-14, p. 32).  Dr. Davis concluded that Ms. Hudson's depressive disorder caused no limitations in her ability to understand, remember, and carry out work-related instructions; mild to moderate limitations in her ability to interact appropriately with supervisors, co-workers, and the public; and mild to moderate limitations in her ability to respond to changes in the work-setting. (Doc. 9-14, pp. 26-27).

*Dr. David Wilson's Psychological Examination*

On April 19, 2017, Ms. Hudson saw psychologist David Wilson at her attorney's request. (Doc. 9-3, p. 9). Dr. Wilson reviewed Ms. Hudson's "extensive psychiatric records" dating to 2010 and Dr. Nichols's August 2015 medical opinion. (Doc. 9-3, p. 9). Ms. Hudson reported that she lived with her son and his wife, and their daughter. (Doc. 9-3, p. 10). She stated that she went on walks, attended church, sang in a choir, attended Bible study, and enjoyed going to movies and dinner with her boyfriend who was a truck driver. (Doc. 9-3, pp. 11-12). Ms. Hudson told Dr. Wilson that she had not worked because of her "leg and back pain." (Doc. 9-3, p. 11).

She stated that she did not have "specific traumatic experiences" in Afghanistan, but the experience was "scary," and she "had to walk around with loaded weapons." (Doc. 9-3, p. 11). Ms. Hudson reported bad dreams, drowsiness, fear of crowded areas, flashbacks from "over there," hypervigilance, irritation, low energy, obsession with cleaning, and sleep issues. (Doc. 9-3, p. 11).

Dr. Wilson noted that Ms. Hudson had problems with mental control and attention; had "serious problems with short term memory and working memory" because she recalled "0 of 3 items after 10 minutes"; had difficulty retrieving information that she should know, including information about her educational

background; and "could do simple math but not a more complex calculation." (Doc. 9-3, p. 12).

Dr. Wilson diagnosed Ms. Hudson with major depressive disorder, recurrent, severe; panic disorder without agoraphobia; post-traumatic stress disorder; and obsessive-compulsive disorder. (Doc. 9-3, p. 12). Dr. Wilson opined that Ms. Hudson had marked mental restrictions in all areas of mental functioning, including her abilities to understand, remember, or apply information; to interact with others; to concentrate and persist or maintain pace; and to adapt or manage herself. (Doc. 9-3, p. 15). Dr. Wilson concluded that "working [would be] very difficult" for Ms. Hudson because her medications caused "drowsiness and sedation"; she would be off task 75% of the day; and she would miss 25 days of work each month. (Doc. 9-3, pp. 12, 14). Dr. Wilson opined that Ms. Hudson's limitations "existed back to 12/17/12" and were not likely to improve in twelve months. (Doc. 9-3, pp. 12, 14).

*Dr. Robert Heidrich's Opinion*

On January 15, 2020, at the request of the ALJ, psychologist Robert Heidrich reviewed Ms. Hudson's medical records and answered interrogatories regarding her mental impairments. (Doc. 9-27, pp. 90, 101-108). Dr. Heidrich identified Ms. Hudson's "major depressive disorder" as the "primary mental health issue addressed in the medical records." (Doc. 9-27, p. 104). He also stated that Ms. Hudson's

mental health issues were "secondary to physical issues" and would "vary over time." (Doc. 9-27, p. 105).

Dr. Heidrich opined that Ms. Hudson had no impairments in her ability to understand, remember, and carry out instructions; no impairments in her ability to concentrate, persist, or maintain pace; and mild impairments in her ability to interact with the public, supervisors, and co-workers and her ability respond to usual work situations and routines. (Doc. 9-27, pp. 101-102). Dr. Heidrich indicated that that Ms. Hudson's depression and anxiety might cause "some absenteeism." (Doc. 9-27, p. 108). Dr. Heidrich concluded that Ms. Hudson "would perform best in an environment where supervisors underst[ood] these issues and [were] supportive." (Doc. 9-27, p. 108).

*Dr. June Nichols's 2020 Psychological Evaluation*

On May 20, 2020, Dr. Nichols completed a mental health source statement concerning Ms. Hudson's mental limitations and evaluated Ms. Hudson on December 5, 2020 at the request of Ms. Hudson's attorney. (Doc. 9-28, pp. 7, 15). Ms. Hudson reported that after her 2012 hospitalization for severe depression, she lived with her son in Huntsville for three years and self-isolated. (Doc. 9-28, p. 13). Dr. Nichols noted that Ms. Hudson was "now able to live independently, shop and care for herself." (Doc. 9-28, p. 13).

Dr. Nichols diagnosed Ms. Hudson with PTSD, major depressive disorder, and panic disorder. (Doc. 9-28, pp. 13-14). Dr. Nichols opined narratively that "Ms. Hudson [could] understand, remember and carry out very short and simple instructions." (Doc. 9-28, p. 13). In Dr. Nichols's medical source statement, she indicated by checkmark that Ms. Hudson could not understand, remember, or carry out very short and simple instructions; could not maintain attention, concentration, or pace for at least two hours; could not work within a schedule and be punctual; could not sustain an ordinary routine without special supervision; could not adjust to routine and infrequent work changes; and could not interact with supervisors and co-workers. (Doc. 9-28, p. 15). Dr. Nichols concluded that these limitations would cause Ms. Hudson to be off task 45% during a workday and to miss 15 days of work each month. (Doc. 9-28, pp. 13, 15).

### *Nonmedical Source Opinions*

In 2015, Ms. Hudson's sons, Pierre and Chedrick Edwards, submitted written documents regarding their mother's physical and mental conditions. (Doc. 9-8, pp. 24-31, 37-40). Pierre reported that Ms. Hudson's mental health had deteriorated "over the past few years, and that she only slept "a few hours every night" following her deployment to Afghanistan. (Doc. 9-8, p. 37). Pierre reported that Ms. Hudson was depressed, and at times he did not recognize her. (Doc. 9-8, p. 37). Pierre stated that eating and getting dressed were a struggle for Ms. Hudson, and she barely spoke

to him.  (Doc. 9-8, p. 37).  He indicated that Ms. Hudson was detached from her only granddaughter and distanced herself from the family.  (Doc. 9-8, p. 37).  Pierre stated that Ms. Hudson did "not like talking or being with friends or family" and had a "fear of people especially in large crowds."  (Doc. 9-8, pp. 29-30).  Pierre reported that his mother came to live with him so he could help her, but "[m]entally [he] could not get through to her."  (Doc. 9-8, p. 38).  Pierre reported that "years later," his mother's depression improved, but she still dealt with depression.  (Doc. 9-8, p. 38).

Ms. Hudson's son Chedrick stated that "[s]ince [his] mother's deployment, there [had] been significant changes in her health both physically and mentally." (Doc. 9-8, p. 39).  Chedrick stated that his mother "shared how returning home [from Afghanistan] and seeing armed guards at banks, schools, and other places would remind her of when she was deployed."  (Doc. 9-8, p. 39).  Chedrick indicated that his mother became so depressed that she had to move in with his brother.  (Doc. 9-8, p. 39).  He reported that because of her depression, Ms. Hudson "became very secluded, cut off relationships, stayed in bed most of the day, never wanted to be seen by friends or family, and stopped attending church."  (Doc. 9-8, p. 39).  He reported that Ms. Hudson did not sleep well  because she could not "settle her mind" and was "very fatigued during the day."  (Doc. 9-8, pp. 39-40).  Chedrick indicated that his mother had made improvements but still had "down days and suffer[ed] bouts of depression."  (Doc. 9-8, p. 39).

### *Ms. Hudson's Department of Veterans Affairs Disability Rating*

On September 25, 2015, the Department of Veterans Affairs determined that Ms. Hudson had a service-related disability rating of 60% and was entitled to VA disability benefits. (Doc. 9-13, pp. 177, 182). Ms. Hudson's 60% disability rating included a 30% disabling rating for "major depressive disorder," which the VA found caused Ms. Hudson to have "occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks." (Doc. 9-13, pp. 179-80). As grounds for the 30% disability rating for her major depressive disorder, the VA noted Ms. Hudson's depressed mood, anxiety, suspiciousness, panic attacks, chronic sleep impairment, and mild memory loss. (Doc. 9-13, p. 179). The VA found that Ms. Hudson did not suffer from posttraumatic stress disorder because of her military service. (Doc. 9-13, p. 181). Ms. Hudson's overall 60% VA disability rating also included a 20% rating for "degenerative disc disease [of] the lumbar spine." (Doc. 9-13, p. 180).

In November 2015, Ms. Hudson requested an increase in her disability rating for her major depressive disorder. (Doc. 9-14, p. 8). In March 2016, the VA increased Ms. Hudson's disability rating for her major depressive disorder from 30% to 50% effective December 28, 2015 because her depression had "worsened." (Doc. 9-14, p. 3). As support for the disability rating increase, the VA cited Ms. Hudson's panic attacks, suspiciousness, depressed mood, motivation and mood disturbances,

flattened affect, mild memory loss, anxiety, chronic sleep impairment, and "[o]ccupational and social impairment with reduced reliability and productivity." (Doc. 9-14, pp. 9-10). The VA continued Ms. Hudson's 20% disability rating for her degenerative disc disease and 10% disability each for left and right lower extremity radiculopathy associated with her degenerative disc disease. (Doc. 9-14, p. 10). The VA determined that Ms. Hudson's "combined service[-]connected disabilities [were] 70 percent disabling." (Doc. 9-14, p. 12).

In the VA's March 2016 decision increasing Ms. Hudson's disability rating, the VA denied Ms. Hudson's "[e]ntitlement to individual unemployability" because she was "considered capable of gainful employment" but was "only able to do sedentary work." (Doc. 9-14, p. 12). The VA explained that the "Vocational Rehabilitative Narrative Report show[ed] that [Ms. Hudson's] current mental health [did] not permit [her] to begin training towards suitable employment within a reasonable period of time" because her major depressive disorder and anxiety affected her "ability to obtain and maintain suitable employment and interacting with people in public or large crowds." (Doc. 9-14, p. 12). A "VA mental exam" showed that Ms. Hudson likely would "perform best in a job that allows for some flexibility of work schedule"; that she might have "problems completing tasks correctly and efficiently"; that she likely would "function better in a job that involve[d] routine or

repeated tasks; and that she "should not work in an environment with a lot of people." (Doc. 9-14, p. 12).

### Ms. Hudson's Administrative Hearing

At her December 18, 2019 administrative hearing, Ms. Hudson was 57 years old and had a bachelor's degree in human services. (Doc. 9-18, pp. 54-55). She stated that she had been disabled since 2012 and had not looked for a job or worked since that time. (Doc. 9-18, pp. 56, 58). Ms. Hudson testified that her anxiety, depression, back pain, hand pain, and concentrating and memory troubles affected her ability to work. (Doc. 9-18, p. 58).

Ms. Hudson testified that she served 23 years as a chemical specialist with the Army Reserves and retired in 2007. (Doc. 9-18, p. 55). She stated that she also had worked at Keystone Foods as a hand packer, at the YMCA as a youth counselor, and as a housecleaner. (Doc. 9-18, pp. 56-58).

Regarding her hospitalization for major depression in 2012, Ms. Hudson recalled that she would not bathe, talk, or get dressed. (Doc. 9-18, p. 70). Ms. Hudson testified that between 2012 to 2014, she experienced severe depression symptoms about five to six days a week. (Doc. 9-18, p. 70). She stated that she had to live with her son in Huntsville, never wanted to leave the house, and did not attend church. (Doc. 9-18, pp. 70-71). Ms. Hudson testified that she did not receive

medical treatment during that time because she was "just out of sorts with reality" and did not want to "think about anything."  (Doc. 9-18, p. 71).

She testified that at the time of the hearing, she experienced severe depression symptoms about six days a month.  (Doc. 9-18, p. 70).  Regarding her anxiety and depression, Ms. Hudson explained that she had trouble concentrating and staying focused.  (Doc. 9-18, p. 62).  She explained that when she drove to a particular place, she would pass the place and would have to turn around; she lost focus at times when she drove.  (Doc. 9-18, p. 62).  Ms. Hudson said that her anxiety and depression medications helped.  (Doc. 9-18, p. 62).

Regarding her back pain, Ms. Hudson stated that she had neck stiffness and leg pain after standing a while.  (Doc. 9-18, p. 61).  She testified that at the time of the hearing, she had pain in her shoulders all the way to her spine.  (Doc. 9-18, p. 62).  She testified that between 2012 and 2014, tramadol and lidocaine patches helped with her back issues.  (Doc. 9-18, p. 60).  Ms. Hudson stated that she started taking oxycodone around 2014 because tramadol was not helping, and she needed a "stronger medication."  (Doc. 9-18, p. 62).  She testified that she tried "not to take it but like once a week because of the effects of addiction to it" and was "kind of afraid" of oxycodone.  (Doc. 9-18, p. 63).

Ms. Hudson testified that she started having problems with both hands two years prior.  (Doc. 9-18, p. 63). She stated that she dropped items, did not have much

strength in her hands, and noticed her fingers had started to "curl up." (Doc. 9-18, p. 63). Ms. Hudson indicated that the VA doctors had ruled out carpal tunnel, and she had another appointment scheduled regarding her hand issues. (Doc. 9-18, p. 63).

Ms. Hudson testified that, prior to 2014, she could lift 10-15 pounds, walk for only 30 minutes, and sit for only 20 minutes because of her pain. (Doc. 9-18, p. 64). She stated that she did not drive between December 2012 and March 2015 and that she could bend over to pick up something but preferred not to, could squat using her knees, could grip a coffee cup and a doorknob, and could pick up a pen and paper. (Doc. 9-18, pp. 65-66).

Ms. Hudson testified that at the time of the hearing, she lived alone, went to church, socialized outside of her house, bathed herself, made simple meals, washed dishes, and made her bed. (Doc. 9-18, pp. 54, 55, 66). She stated that her son helped her clean her bathroom and sweep, mop, and vacuum. (Doc. 9-18, p. 66). Ms. Hudson indicated that during a typical day, she mostly sat and stared out the window. (Doc. 9-18, p. 67). Ms. Hudson testified that between "8:00 a.m. and 5:00 p.m." she laid down or slept about four hours. (Doc 9-18, p. 69).

Robert Moseley testified as a vocational expert at Ms. Hudson's administrative hearing. (Doc. 9-18, p. 75). Mr. Moseley classified Ms. Hudson's past relevant work in the Army Reserves as a chemical specialist as light work with

an SVP of 5 and her work as a hand packer at Keystone Foods as medium work that she performed at the light exertional level.  (Doc. 9-18, p. 76).  The ALJ did not ask Mr. Moseley to classify Ms. Hudson's past work as a camp counselor or housecleaner.  (Doc 9-18, p. 76).

The ALJ asked Mr. Moseley to assume a hypothetical person with the same age, education, and past work experience as Ms. Hudson with the following limitations:

> [the] individual can occasionally climb ramps and stairs, never climb ladders, [occasionally climb] ropes or scaffolding, []frequently balance, stoop, kneel, crouch, and crawl.  The individual could never work at unprotected heights, should only occasionally be exposed to extreme cold or vibrations.  From a mental perspective, the individual [was] able to perform simple, routine tasks.  The individual [was] able to have occasional contact with coworkers and supervisors.  By that I mean an individual who [could] work in proximity to others, but not on a team position.  Such an individual [could] have occasional contact with the general public.

(Doc. 9-18, p. 77).   Mr. Moseley testified that individual could perform Ms. Hudson's past work as a hand packer at the light exertional level.  (Doc 9-18, p. 77).  Mr. Mosely testified that the person also could work at the light exertional level as a marker, routing clerk, and cleaner, and that those jobs existed in significant numbers in the national economy.  (Doc. 9-18, pp. 77-78).  Mr. Mosley clarified that this hypothetical person could not perform a full range of light work.  (Doc. 9-18, p. 78).   Mr. Mosely testified that if pain or mental limitations would cause the individual to be off task more than twenty percent of the workday or miss work more

than one day per month, that person would be precluded from all employment at all exertional levels.  (Doc 9-18, p. 78).

### *Ms. Hudson's Supplemental Administrative Hearing*

Because the ALJ received Dr. Heidrich's responses to the medical interrogatories after the initial administrative hearing, the ALJ held a supplemental administrative hearing via telephone on June 17, 2020.  (Doc. 9-18, p. 85).  Ms. Hudson's attorney urged the ALJ to consider that both Dr. Heidrich and another physician, Dr. Todorov, only reviewed records and did not exam Ms. Hudson.  (Doc. 9-18, p. 86).  Vocational expert Mary Kessler testified.  (Doc. 9-18, p. 87).

Ms. Kessler classified Ms. Hudson's job in the Army Reserves as a chemical specialist as skilled, medium work and her job as cleaner as semi-skilled, medium work.   (Doc 9-18, p. 87).  The ALJ asked the VE to assume a hypothetical person with the same age, education, and past work experience as Ms. Hudson with the following limitations:

> [The individual could] lift [and] carry 20 pounds occasionally [and] 10 pounds frequently, . . .sit for three hours at a time for a total of 8 hours, . . . stand for 2 hours at a time for a total of four hours, . . . walk for one hour at a time for a total of two hours[,]. . . [p]ush and pull as much as lift and carry[,] . . . [and] occasionally stoop, kneel, and crouch, but should never crawl.

(Doc. 9-18, p. 88).   The ALJ clarified that the sitting, standing, and walking limitations "could be done alternatively."  (Doc. 9-18, p. 89).  Ms. Kessler testified that an individual with those limitations could work as a ticket seller and taker, a

general office clerk, a receptionist, and an information clerk, which are all classified as unskilled, light jobs that existed in significant numbers in the national economy. (Doc 9-18, p. 89).

The ALJ modified the hypothetical to include an individual who could understand, remember, and carry out simple instructions; could work in proximity to others but not in a "team-type" position; could have occasional contact with the public; and could tolerate infrequent and well-explained changes in the workplace. (Doc. 9-18, p. 90).  Ms. Kessler testified that the hypothetical individual could work in the general office clerk position.  (Doc. 9-18, p. 90).  Ms. Kessler further testified that if the hypothetical individual could not understand or carry out simple and short instructions, no job existed for that individual.  (Doc. 9-18, p. 91).

## THE ALJ'S DECISION

The ALJ found that Ms. Hudson had not engaged in substantial gainful activity since the application date of December 17, 2012, and that she met the insured status requirements through September 20, 2014.  (Doc. 9-18, p. 18).  The ALJ determined that Ms. Hudson suffered from the severe impairment of degenerative disc disease of the lumbar spine.  (Doc. 9-18, p. 18).  The ALJ found that Ms. Hudson suffered from the non-severe physical impairments of "mild spurring in the bilateral feet, swelling of the lower extremities, mild bilateral knee osteoarthrosis and demineralization in the right lower leg, plantar fasciitis, antral ulcers, functional

dyspepsia, gastroesophageal reflux disease, irritable bowel syndrome, obstructive sleep apnea, hypertension, hyperlipidemia, hypothyroidism, impacted comminuted fracture of the distal radius, left lower leg abscess/cellulitis, mild Dupuytren's contractures, vitamin D deficiency, obesity, and chronic leukocytopenia." (Doc. 9-18, p. 18). The ALJ determined that Ms. Hudson's depression and anxiety were non-severe mental impairments and that her "posttraumatic stress disorder, compulsive disorder, and panic disorder" were not medically determinable impairments. (Doc. 9-18, p. 21). Based on a review of the medical evidence, the ALJ concluded that Ms. Hudson did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1. (Doc. 9-18, p. 29).

Considering Ms. Hudson's impairments, the ALJ evaluated Ms. Hudson's residual functional capacity. The ALJ determined that Ms. Hudson had the RFC to perform:

> light work . . . except lifting 20 pounds occasionally and 10 pounds frequently, carrying 20 pounds occasionally and 10 pounds frequently, sitting for three hours at a time for a total of eight hours, standing for two hours at a time for a total of four hours, and walking for one hour at a time for a total of two hours. She [could] push and pull as much as she [could] lift and carry. She [could] occasionally stoop, kneel, and crouch, and never crawl.

(Doc. 9-18, p. 30).

Based on this RFC, the ALJ concluded that Ms. Hudson could not perform her past relevant work as a chemical lab specialist or a housecleaner. (Doc. 9-18, p. 38). Relying on testimony from the VE, the ALJ found that prior to December 15, 2017, jobs existed in significant numbers in the national economy that Ms. Hudson could perform at the light exertional level, including ticket seller and taker, receptionist and information clerk, and general office clerk. (Doc. 9-18, p. 40). The ALJ found that Ms. Hudson's became disabled on December 15, 2017, the date her age category changed from "an individual closely approaching advanced age" to "an individual of advanced age." (Doc. 9-18, p. 39). The ALJ found that no jobs existed that Ms. Hudson could perform after December 15, 2017. (Doc. 9-18, p. 39).

Because the ALJ determined that Ms. Hudson was not disabled prior to the date she was last insured on September 30, 2014, the ALJ found Ms. Hudson was not entitled to disability insurance benefits. (Doc. 9-18, pp. 40-41). The ALJ determined that Ms. Hudson was under a disability as defined by the Social Security Act beginning on December 15, 2017 and entitled to supplemental security income beginning on that date. (Doc. 9-18, p. 41).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close

scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).   If the ALJ's decision is supported by substantial evidence, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### Finding of No Severe Mental Impairment

Ms. Hudson argues that substantial evidence does not support the ALJ's finding that she did not have a severe mental impairment.  The Court agrees.

At step two in the sequential analysis of disability, an ALJ must consider the severity of a claimant's impairments.  20 C.F.R. § 416.920(a)(4)(ii).  If an ALJ finds at least one severe impairment at step two, proceeds to the remaining steps, and considers all severe and non-severe impairments in evaluating an RFC, then an error in finding an impairment non-severe at step two may be harmless.  *See Burgin v. Comm'r of Soc. Sec.*, 420 Fed. Appx. 901, 902-03 (11th Cir. 2011) (finding harmless error when the ALJ considered the claimant's severe and non-severe impairments at later steps in the evaluation and substantial evidence supported the ALJ's findings).  Here, at step two, the ALJ found that Ms. Hudson had the severe impairment of degenerative disc disease and proceeded to the next steps in the sequential analysis.  (Doc. 9-18, pp. 18-41) [6]  Therefore, an error in overlooking a severe mental impairment at step two is harmless unless "the error at step [two] infected another portion of the evaluation process."  *Newton v. Astrue*, No. 1:06-cv-1542-AJB, 2008 WL 915923, at *10 (N.D. Ga. Apr. 1, 2008).  Therefore, the Court examines the

---

[6] Substantial evidence supports the ALJ's finding that Ms. Hudson had the severe impairment of degenerative disc disease.  (*See, e.g.*, Doc. 9-11, p. 208; Doc. 9-12, p. 2; Doc. 9-13, p. 92; Doc. 9-16, p. 85; Doc. 9-24, pp. 53-59).

ALJ's analysis of Ms. Hudson's mental impairment at step two and later with respect to the RFC the ALJ assigned Ms. Hudson.  The Court notes that in explaining Ms. Hudson's RFC, the ALJ reiterated that Ms. Hudson "ha[d] no severe mental impairment" and that she had not experienced a period of 12 continuous months in which her depression and anxiety had "caused more than minimal functional limitations or restrictions."  (Doc. 9-18, p. 32).

With respect to mental limitations, an impairment "is not severe if it does not significantly limit" a claimant's "mental ability to do basic work activities."  20 C.F.R. § 416.922(a).  "Basic work activities" include: understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. *Stacy v. Comm'r, Soc. Sec. Admin.*, 654 Fed. Appx. 1005, 1009 (11th Cir. 2016) (citing 20 C.F.R. § 404.1521(b)).  In other words, an impairment is not severe "if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984).  If evidence "indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities," then the impairment is severe.  20 C.F.R. § 404.1520a(d)(1).

For mental impairments, the ALJ must first determine whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1); (R. at 22.)  If so, the ALJ must "rate the degree of [the claimant's] functional limitation resulting from the impairment" in four "broad functional areas"—the ability to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."  20 C.F.R. § 404.1520a(c)(2)-(3).  The rating involves a "five-point scale: [n]one, mild, moderate, marked, and extreme."  20 C.F.R. § 404.1520a(c)(4).  A rating of "none" or "mild" generally indicates to the ALJ that the claimant's impairment is not severe.  20 C.F.R. § 404.1520a(d)(1).

Here, at step two, the ALJ discussed Ms. Hudson's mental health records in some detail.  (Doc. 9-18, pp. 21-29).  The ALJ found that the administrative record did not indicate that Ms. Hudson had the medically determinable impairments of posttraumatic stress syndrome, compulsive disorder, and panic disorder.  (Doc. 9-18, p. 21).  The ALJ correctly pointed out that Ms. Hudson's "voluminous longitudinal treating mental health records from the Veterans Administration" did not indicate a formal diagnosis for any of these mental disorders.  (Doc. 9-18, p. 21).  The ALJ also pointed to Dr. Clements's August 2015 assessment that Ms. Hudson did not meet the criteria for a posttraumatic stress syndrome diagnosis.  (Doc. 9-18, p. 21).  Substantial evidence supports the conclusion that Ms. Hudson was not

diagnosed with PTSD, compulsive disorder, or panic disorder at the time of the ALJ's decision.

Substantial evidence does not support the ALJ's findings regarding Ms. Hudson's depression.  Ms. Hudson's voluminous longitudinal mental health records from the Veterans Administration reflect long-term treatment for major depressive disorder and anxiety, dating to 2004 and becoming particularly severe in 2012.  At step two, the ALJ found that Ms. Hudson had the determinable mental impairment of "depression with anxiety" but concluded that her mental health treatment records did not show that the impairment caused "more than minimal functional limitations or restrictions for any period of 12 continuous months since the alleged onset date of disability."  (Doc. 9-18, p. 24).  The ALJ found "no medical evidence [in the] record to support [Ms. Hudson's] allegation of disabling mental or physical impairment or limitations from December 17, 2012, through the date last insured of September 30, 2014, or through the present."  (Doc. 9-18, p. 22).

In fact, Ms. Hudson's medical records reveal severe disabling mental impairments and limitations between December 2012 and December 2017, the date the ALJ found that Ms. Hudson became disabled.  The ALJ observed that Ms. Hudson received little mental health treatment at the VA between her hospitalization for severe major depressive disorder in March 2012 and April 2015, (Doc. 9-18, p.

22), but the ALJ did not consider the reasons for her scarce treatment over that three-year period.

The record demonstrates that Ms. Hudson did not seek, and at times refused, mental health treatment between 2012 and 2015 because severe depression compromised her thought processes and her assessment of her need for care. *See Sparks v. Barnhart*, 434 F. Supp. 2d 1128 (N.D. Ala. 2006) ("In assessing the plaintiff's failure to follow through with recommended mental health treatment, the ALJ failed to consider the impact of the plaintiff's mental illness itself."). "Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment[,]" because "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Sparks*, 434 F. Supp. 2d at 1135-36 (quoting *Nguygen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (internal quotations omitted)).

Here, although Ms. Hudson showed signs of severe depression leading up to and during her 2012 hospitalization, Ms. Hudson denied being depressed, and Dr. Howell admitted her for psychiatric inpatient treatment because of her "lack of insight." (Doc. 9-11, p. 104). To find that Ms. Hudson's depression was not severe between 2012 and 2015 because she failed to seek mental health treatment when she had impaired insight into her mental illness and "exhibit[ed] precisely the sort of symptoms that her mental illness would be expected to cause" was error. *See Sparks*,

434, F. Supp. 2d at 1136.  Ms. Hudson's mental health records show that her son repeatedly sought treatment for her in 2012 precisely because she refused to get help. (Doc. 9-11, p. 104).

Ms. Hudson's VA medical records indicate that throughout 2010 and 2011, leading up to her hospitalization in 2012, she struggled with depression and anxiety, isolated herself, lost a considerable amount of weight because she refused to eat, had intrusive memories from her time in Afghanistan, and did not do well in crowds. (Doc. 9-11, pp. 104-05, 142, 156, 191; Doc. 9-12, pp. 14, 30, 45).  During that time, CRNP Morris increased Ms. Hudson's Zoloft prescription, switched her prescription to Effexor because the Zoloft was not working; and added a prescription for Abilify for Ms. Hudson's depression.  (Doc. 9-11, pp. 143, 192, 179-80).  Ms. Hudson experienced a major deterioration in her "mood, personality, and overall mental health" and was hospitalized in March 2012 for her major depressive disorder.  (Doc. 9-11, pp. 103-04).  Ms. Hudson and her sons attended a mental health appointment on June 11, 2012.  (Doc. 9-11, p. 98).  Ms. Hudson reported that she was "doing ok," but her sons disagreed because Ms. Hudson had stopped going to church and "did not get out of the house."  (Doc. 9-11, p. 99).  Ms. Hudson's son reported that Ms. Hudson had no interest in activities, would not leave the house, refused to eat, and stopped going to church.  (Doc. 9-11, p. 104).

In November 2012, Ms. Hudson's son called the VA and reported that his mother was in a "deep depression and [was] not getting better." (Doc. 9-11, p. 81). Ms. Hudson refused to seek treatment from the VA. (Doc. 9-11, p. 82). Ms. Hudson had to live with her son, did not want to leave the house, refused to eat, and did not want to interact with her grandchild. (Doc. 9-8, pp. 37-40; Doc. 9-11, p. 62; Doc. 9-18, pp. 7-71; Doc. 9-28, p. 13). When Ms. Hudson and her son visited a social worker at the VA Mental Health Clinic in Decatur in April 2013, Ms. Hudson that she "need[ed] medication only and [did] not want therapy." (Doc. 9-11, p. 79). Her son asked that his mother receive therapy for her isolation and lack of socialization. (Doc. 9-11, p. 79). When Ms. Hudson saw a psychiatrist at the VA Mental Health Clinic on May 7, 2013, she reported that she had "been off medications for several months." (Doc. 9-11, p. 72). She reported that she was "not sure she need[ed] medications." (Doc. 9-11, p. 72). After Dr. Harris spent an hour with Ms. Hudson, he diagnosed Ms. Hudson with "[m]ajor depression recurrent, moderate" and restarted her prescriptions for Effexor, Zyprexa, and Remeron for depression. (Doc. 9-11, p. 75). Ms. Hudson lived with her son until March 2015. (Doc. 9-18, p. 69).

Ms. Hudson testified that her depression was so severe between 2012 and 2015 that she would not bathe, talk to anyone, or get dressed for four or five days each week. (Doc. 9-18, p. 70). Ms. Hudson's failure to seek mental health treatment

during those three years was consistent with the symptoms of major depressive disorder that Ms. Hudson's reported during the administrative hearing.

Ms. Hudson's sons' written submissions corroborate her testimony regarding the severity of her major depressive disorder.  The ALJ gave little weight to Ms. Hudson's sons' reports because they were not disinterested parties and because their "firsthand knowledge" accounts of Ms. Hudson's mental condition during that time were "not consistent with the medical evidence of record."  (Doc. 9-18, p. 37).  The ALJ did not explain how Ms. Hudson's sons' descriptions of her mental health during that time were inconsistent with the medical record.  In fact, both of Ms. Hudson's sons attributed her lack of mental health treatment between 2012 and 2015 to her severe depression and self-isolation during that time.  Ms. Hudson's medical mental health records from 2012 and 2013 capture Ms. Hudson's effort to avoid interactions with health care providers and to maintain her isolation.  Ms. Hudson's severe depression between 2012 and 2015 reasonably explains her lack of mental health treatment and her failure to comply with her prescription medication during that time and contradict the ALJ's finding that Ms. Hudson's depression was not severe or debilitating for any 12-month period after her alleged onset date in 2012.

In August 2015, psychologist Dr. Kristi Clements at the VA Mental Health Clinic opined that Ms. Hudson's depressive disorder would cause "occasional

decrease in work efficiency and intermittent periods of inability to perform occupational tasks." (Doc. 9-13, pp. 148-49).

Dr. Davis's and Dr. Heidrich's medical opinions also indicate that Ms. Hudson's depression and anxiety caused limitations on her ability to sustain a full-time job. In 2015, Dr. Davis diagnosed Ms. Hudson with "[d]epressive disorder, unspecified, mild to moderate features." (Doc. 9-14, p. 32). Dr. Davis opined that Ms. Hudson had mild to moderate limitations in her ability to interact appropriately with supervisors, co-workers, and the public, and that Ms. Hudson had mild to moderate limitations in her ability to respond to changes in the work setting. (Doc. 9-14, p. 32). Dr. Davis's moderate limitation findings are consistent with Ms. Hudson's major depressive disorder and indicate that Ms. Hudson's depression was more than a slight abnormality that caused only minimal limitations. The ALJ gave Dr. Davis's opinion "good weight" but did not include mental limitations in Ms. Hudson's RFC to account for a moderate limitation in her ability to interact with people or respond to changes in the work setting.

Dr. Heidrich also indicated that Ms. Hudson had mental limitations that would affect her ability to work. Dr. Heidrich found that Ms. Hudson had major depressive disorder, that her physical impairments could adversely affect her mental functioning, and that the severity of Ms. Hudson's symptoms would "vary over time." (Doc. 9-27, p. 105). The ALJ gave Dr. Heidrich's opinion "great weight,"

(Doc. 9-18, p. 37), but the ALJ did not address Dr. Heidrich's opinion that Ms. Hudson should work in an environment where employers were supportive of her major depressive disorder, (Doc. 9-27, p. 108).

Dr. Heidrich indicated that Ms. Hudson's depression and anxiety could cause some work absences, but he did not specify how many.  In December 2019, Ms. Hudson testified that as of the date of the hearing, she typically suffered severe depression symptoms six days in a 30-day period, as compared to four to five days per week between December 2012 and September 2014.  (Doc. 9-18, p. 70).  The VE testified that employers would not tolerate more than one day of absence per month.  (Doc. 9-18, p. 78).

In March 2016, the VA determined that Ms. Hudson's mental health records produced a VA disability rating of 50% for major depressive disorder effective December 2015.  (Doc. 9-14, pp. 8-10).  The VA selected the rating in part because of Ms. Hudson's "occupational and social impairment with reduced reliability and productivity."  (Doc. 9-14, p. 10).  "Though not binding, an ALJ must give a VA disability rating great weight and must scrutinize the rating carefully when a claimant's impairment is combat related."  *Johnson v. Berryhill*, 382 F. Supp. 3d 1200, 1214 (N.D. Ala. 2019) (citing *DePaepe v. Richardson*, 464 F.2d 92, 101 (5th Cir. 1972)); *see also Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. Mar.

1981).[7]  The ALJ acknowledged Ms. Hudson's VA disability rating but noted that the VA "denied entitlement to the 100% rate" because Ms. Hudson had not shown that "she was unable to work as a result of her service [-] connected disability/disabilities."  (Doc. 9-18, p. 36).  The ALJ concluded that Ms. Hudson's "longitudinal [VA] records and [the VA's disability] decision [were] not inconsistent" with Ms. Hudson's RFC for light work without mental restrictions. (Doc. 9-18, p. 36).

But an RFC devoid of mental restrictions is incompatible with the VA's finding of a 50% mental health disability rating that rested on Ms. Hudson's "occupational and social impairment with reduced reliability and productivity" as of March 2016, a date that falls within the period of time that the ALJ examined.  In her opinion, the ALJ did not address the VA's March 2016 finding that Ms. Hudson she could not participate in vocation training then because in 2016, Ms. Hudson's mental health affected her "ability to obtain and maintain suitable employment and interact[] with people in public or large crowds."  (Doc. 9-14, p. 12).  The ALJ did

---

[7]  For claims filed after March 27, 2017, an ALJ does not have to provide "analysis . . . about a decision made by any other governmental agency . . . about whether [the claimant] [was] entitled to any benefits."  *See* 20 C.F.R. § 404.1504 (2020) (effective March 27, 2017).  Because Ms. Hudson filed her disability claim in 2015, the law cited in *Johnson* applies to her case.

In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

not discuss the VA's 2016 finding that Ms. Hudson's mental exam indicated that she would perform best with a flexible work schedule, that she might have problems "completing tasks correctly and efficiently," and that she "should not work in an environment with a lot of people." (Doc. 9-14, p. 12). The ALJ's failure to analyze or assign weight to the functional limitations in the VA's 2016 disability decision was error.

The Court notes that in her 2017 decision, the ALJ found that Ms. Hudson's "depression and anxiety" were severe impairments, (Doc. 9-3, p. 40), and the ALJ included mental limitations in Ms. Hudson's RFC: "simple, routine tasks"; "occasional contact with the general public"; and occasional contact with coworkers and supervisors but "not in [a] team-type position[]." (Doc. 9-3, p. 44). The ALJ was not bound by her 2017 decision, but nothing in Ms. Hudson's medical records between 2012 and 2017 changed when the ALJ reviewed Ms. Hudson's depression and anxiety in 2020.

Significantly, to fully address Ms. Hudson's application, the ALJ had several tasks: the ALJ had to determine whether Ms. Hudson was disabled between December 2012 and September 30, 2014 for purposes of Ms. Hudson's claim for disability insurance benefits; whether Ms. Hudson was disabled between December 2012 and December 15, 2017 for purposes of her claim for supplemental security income; and whether Ms. Hudson was disabled for purposes of her claim for

supplemental security income after December 15, 2017 when Ms. Hudson's age category changed from "an individual closely approaching advanced age" to "an individual of advanced age."  The Court cannot tell from the ALJ's opinion if she considered whether Ms. Hudson's depression and related anxiety constituted a severe impairment in any of those timeframes.

## CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence does not support the ALJ's decision.  Accordingly, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.[8]

**DONE** and **ORDERED** this September 25, 2023.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[8] Given this remand, the Court will not address the other issues Ms. Hudson raised in her brief.